Filed 12/12/25  In re K.W. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.W., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> T.R., <br><br> Defendant and Appellant. | A172975 <br><br> (Solano County <br> Super. Ct. No. J45433-001) |

T.R. (Father) appeals after the juvenile court terminated his parental rights to his daughter, K.W.2 (Minor).  He contends that the court relied on improper factors in declining to apply the beneficial relationship exception and that inquiry under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq; see Welf. & Inst. Code, § 224 et seq.; ICWA) was inadequate.[1]  We conditionally reverse the order and remand for the limited purpose of compliance with ICWA.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### *Jurisdiction and Disposition*

This dependency began in January 2022, when the Solano County Health and Social Services Department (the Department) filed a petition on behalf of Minor, then three years old, and her three half-siblings, M.W., then 10 years old, K.W.1, then seven years old, and K.W.3, then two years old, all of whom had been detained. Father is the father of Minor; the other children have different fathers.

We need not set forth the history of this dependency in detail to resolve the limited issues before us on appeal. In brief, according to the dependency petition, the children's mother, M.W. (Mother) left them unsupervised in a disheveled hotel room for several hours without provision or a plan for their care. Mother and Father both had a history of substance abuse, including methamphetamines and cocaine, that periodically impaired their ability to care for the children. They also had a history of domestic violence, most recently when Father punched Mother, pushed her to the ground, and hit seven-year-old K.W.1 in the face.

The trial court sustained the allegations of the petition and took jurisdiction of the children (Welf. & Inst. Code, § 300, subd. (b)) and ordered reunification services to Mother and Father on June 13, 2022.

### *Termination of Reunification Services*

A December 2022 status review report explained that Father had supervised visits with Minor once a week. He attended the visits regularly and behaved appropriately most of the time with Minor, but not always with staff. On one occasion, Father told Minor—referring to Mother—" 'tell that trick she owes me money.' " Minor said she enjoyed visiting with Mother and

Father. Father was not participating regularly in other aspects of his case plan, such as services for drug treatment and domestic violence.

An addendum report of April 2023 explained that Father had completed only portions of his case plan and that despite testing positive for amphetamine three times, he did not recognize how his substance abuse affected his ability to care for Minor. The Department recommended terminating reunification services for Father and Mother.

A contested combined six-month and 12-month review hearing took place on May 24, 2023. The evidence showed that Father had moved to Tennessee in February 2023 and that since then he had participated in video visits with Minor. He expressed his love for Minor and willingness to "do anything" for her. The court terminated reunification services, noting as it did so that although Father loved Minor, he was unwilling to submit to drug testing and had not engaged in services for domestic violence, both matters as to which allegations had been sustained. A hearing to select a permanent plan under section 366.26 was set for September 21, 2023.

***Events Before Section 366.26 Hearing***

The section 366.26 hearing was delayed until early 2025 for reasons we need not detail here. In the interim, Father had supervised virtual visits with Minor each week, and he travelled to California at his own expense for an in-person visit each month. The visits generally went well, and Minor engaged in them, smiled, and hugged Father when prompted, and in September 2023, the Department reported that the visits seemed to be beneficial to Minor.

In November 2023, Father asked for authorization for a bonding study. The Department did not object and explained that the study would be useful for its inquiry into whether the parent/child relationship exception applied.

The juvenile court granted the request and indicated it thought there was a possibility the exception applied.

A March 14, 2024 report said that in January 2024, Father had tested positive for methamphetamine. Minor, then five years old, was happy in her placement, turned to her caregivers for support and care, and referred to them as " 'mommy' " and " 'mama.' " Two of Father's older children also lived in the home. Father continued to have monthly in-person visits with Minor. The visits were positive; they read books, did puzzles, and painted together, and Father showed Minor pictures and videos of herself as a baby and toddler.

Occasional concerns about the visits developed, however. In February 2024, virtual visits were suspended because Minor had repeatedly refused to participate. She said she wanted only in-person visits with Father. The caregivers had expressed concern about one virtual visit, in which they said Father was dismissive and agitated, rambled, and slurred his words when Minor was trying to explain her schoolwork activity. On another occasion, Father allowed Mother to participate in the virtual visit without authorization, confusing and upsetting Minor. After another virtual visit, Minor told the social worker Father had " 'screamed at her' " when she wanted to say goodbye because she was going to her uncle's house. Minor said she was " 'mad' " when that happened. But she described the in-person visits as " 'good.' "

***The Department Initially Recommends Guardianship***

In a September 2024 report, the Department said that Minor, by then six years old, was doing well in her placement. Nevertheless, the Department recommended legal guardianship rather than adoption as the permanent plan due to Minor's relationship with Father and the benefits of

4

the relationship.  Minor appeared to have an established, positive relationship with Father: Father had visited regularly throughout the dependency; Minor participated actively in visits and their interactions were mainly positive; Minor identified him as her father; and maintaining that relationship would provide Minor an "important benefit."  Minor appeared happy and comfortable with Father during visits, and smiled when she saw him and talked with him; Father brought food and toys or activities; and they played together.

### *The Bonding Study*

Two psychologists, Malea Lash and Blake Carmichael, prepared the bonding study.  According to the report, Father saw Minor every day for the first 11 months of her life, when she was living with Mother and Father often slept at their home.  During that time, Father changed Minor's diapers, read to her, and played with her.  He sought custody of Minor when she was 11 months old, due to concerns about Mother's unstable housing, and after that Mother " 'disappeared' " with Minor for 19 months.  When Father regained contact with Mother, Minor was two and a half years old, and Father resumed seeing her every day.  This continued for about six months, until Minor was placed in protective custody in 2022.  Once the dependency began, Father saw Minor every week until he moved to Tennessee with his wife in February 2023.

When interviewed after a visit with Father, Minor said she had been playing with " 'my dad,' " and she said she loved the playtime, particularly playing on his phone.  She felt " 'silly' " and " 'happy' " when saying goodbye to him at the end of visits.  She said that she enjoyed living with her current caregivers, that they loved her, and that she would be sad if she could no longer live with them.  She did not recall what it was like to live with Father,

5

and she said it would be " 'kind of not fun' " to live with him. She did not enjoy virtual visits and said Father and her caregiver had argued during one visit.

During a monitored in-person visit, Father and Minor initially did not "engag[e]" well with each other but became more comfortable with each other as the visit progressed. At one point Father told Minor that the dollhouse toys she was playing with were " 'lame,' " although he continued to join her in playing with them. Minor said after the visit that she enjoyed the play time.

The bonding study explained that "[t]he early formation of a stable relationship between a parent and a child (i.e., typically within the first three years of a child's life) is essential for promoting a child's healthy psychosocial and emotional development" and that it was more challenging to form such a relationship after that time. Minor had spent a majority of her life—and a majority of the first three years of her life—living apart from Father and without daily contact. As a result, Father had served only intermittently in a parenting role. He clearly loved Minor and longed to reunify with her, but it did not appear Minor reciprocated that bond, as exemplified by her frequent failure to respond to Father's bids for attention during visits. The bonding study characterized their relationship as "relatively weak and intermittently positive" and concluded the relationship "does not appear to be what sustains [Minor's] day-to-day functioning or [to be] necessary to ensure her future well-being." And Father continued to focus during visits on his desire to have Minor return to his care, which was likely to confuse her and make it more difficult to establish consistency and stability in her life.

6

***The Department Changes its Recommendation***

In October 2024, after the Department received the bonding study, it changed its recommendation to termination of parental rights and adoption as the permanent plan.

According to the Department, Minor's caregivers reported that she did not ask for or mention Father and that she referred to him by his first name or by spelling out the word " 'dad.' "  Similarly, Minor's therapist said that Minor did not refer to Father as " 'dad' " and that she had said she did not want in-person visits with him.  Minor had said on at least one occasion that she did not want to attend a visit with Father, but she responded well to him during visits, calling him both by his first name and by the word " 'dad.' "  At least twice during visits, Father corrected Minor when she referred to one of her caregivers as her mom, saying " 'that is not your mom.' "

***Section 366.26 Hearing***

The section 366.26 hearing began on February 26, 2025.  Minor testified that she visited with Father "[a] lot" and that some visits were good, some were bad.  On the "bad" visits, "he says stuff about [Minor's] family, like, he says Mommy and Mama are not my parents."  On the "good" visits, Minor played and had fun.  She did not know if she loved Father, she did not know if he loved her, and she said if she could not see him anymore she would not be sad and would be "okay with that."

Father also testified at the hearing.  When asked if Minor was attached to him, he answered, "Yes.  She is the best part of me."  When asked what was the biggest thing Minor would miss out on if the court terminated parental rights, he replied, "[J]ust for myself, just her, she's my redemption. . . .  [S]he'd be deprived of so much. Not just for me, but for herself because the world is vast, and she is going to miss out on a whole lot."

He said he would "do anything for her," that he was a "great father," and that he could guide her and give her the benefit of his own experiences. He shared another child with one of the current caregivers, whom she did not allow him to see, and he was certain he would not be able to see Minor if parental rights were terminated.

The social worker assigned to the case testified at the hearing as well. She had observed both virtual and in-person visits between Father and Minor. Minor had told the social worker that she wanted to be adopted and that she had learned about adoption from her "mama" (her care provider). Minor had told the social worker she enjoyed her time with Father.

The social worker had originally recommended against termination of parental rights because the visits seemed to be positive and beneficial to Minor. She changed her recommendation largely as a result of the bonding study; based on its conclusions that the parent-child relationship was weak and intermittently positive, she concluded Minor would be able to function in all settings whether or not she had a relationship with Father. She also took into consideration the positive, parental relationship Minor had with her caregivers when concluding adoption would provide the most stable permanent plan.

The social worker and the caregivers had discussed integrating African American culture into Minor's upbringing. Father is African American, mother is part Asian, and the caregivers are Caucasian. They had African American dolls in the home, Minor was enrolled in an ethnically and racially diverse school, there were other biracial children in the home, and the caregivers had relationships with other African American adults. As to the Asian side of Minor's family, they had monthly visits with Minor's maternal grandmother.

Dr. Carmichael testified as an expert in parent-child bonding assessments. Consistent with the bonding study, he opined that the relationship between Father and Minor was relatively weak and intermittently positive. During the first three years of Minor's life, a critical period, Father saw Minor only inconsistently, and for a time he did not know where she was. As Minor became older, contact was consistent but infrequent. Dr. Carmichael also testified that it could be destabilizing when Father told Minor, " 'That's not your mom' " when she referred to one of her caregivers as " 'mom' " or " 'mama.' "

### *Termination of Parental Rights*

The juvenile court found Father had visited with Minor consistently, that he had shown he was interested in maintaining a relationship with her, that Minor enjoyed the visits, and that the visits were pleasant and good. However, based on the evidence and the bonding study in particular, the court concluded their relationship was "not as strong as the visits seem to indicate." Minor herself had asked not to have virtual visits, her relationship with Father was "at times conflicted," and she had testified she would not be sad if she did not see him again. The court also concluded that Minor needed to be supported in her relationship with her caregivers, but that Father did not offer such support, and that his difficult relationship with one of the caregivers caused stress on his relationship with Minor. Although there was an attachment, the court concluded it was not a "substantial positive attachment."

The juvenile court also noted that Minor had the opportunity for a stable and permanent home, that her needs were being met, and that she was in a home with siblings.

On March 1, 2025, the court terminated the parental rights of Mother and Father and set a permanent plan of adoption. Father timely appealed the order.

## DISCUSSION

### I. Beneficial Relationship Exception

Father does not challenge the sufficiency of the evidence to support the juvenile court's findings. Rather, he argues the authors of the bonding study and the social worker relied on impermissible factors in evaluating the relationship Father shared with Minor and that the juvenile court's ruling, based in part on their findings, was similarly flawed.

***Legal Standards***

When reunification services are terminated, the focus of the proceedings shifts to the child's need for stability and permanency. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) A hearing under section 366.26 is designed to select a permanent plan, in order to "protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52–53 (*Celine R.*).)

At the permanency planning hearing, the juvenile court has several choices, ranked in order of preference. (§ 366.26, subd. (b).) First in preferences is termination of parental rights and placement for adoption. (§ 366.26, subd. (b)(1).) Further down the list are the options of appointing a legal guardian (§ 366.26, subd. (b)(3) & (5)), permanent placement with a relative (§ 366.26, subd. (b)(6)), and long-term foster care (§ 366.26, subd. (b)(7)). In general, if the court finds by clear and convincing evidence that it is likely the child will be adopted, it "shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c).)

10

There are statutory exceptions to the preference for termination of parental rights and adoption, however.  (§ 366.26, subd. (c).)  The exception at issue here applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  The exceptions "permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption"; they do not alter " 'the legislative preference for adoption when reunification efforts have failed.' "  (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

The parent bears the burden to show that this beneficial relationship exception applies.  (*In re J.R.* (2022) 82 Cal.App.5th 526, 530.)  To do so, the parent must prove three elements:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)  In the case before us, there is no dispute that, as the juvenile court found, Father maintained regular visitation and contact with Minor.  The question is whether the court properly found neither of the other two elements satisfied.

In assessing the second element—whether the child would benefit from continuing the relationship—"the focus is on the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' "  (*Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)  Courts may look to how the

11

child feels about, interacts with, looks to, or talks about the parent. (*Caden C.*, at p. 632.) Testimony from an expert psychologist who has observed the parent and child and can "synthesize others' observations" may assist the court in understanding the importance of the relationship to the child. (*Id.* at pp. 632–633.) The juvenile court's finding on this issue is reviewed for substantial evidence. (*Id.* at pp. 639–640.) We do not reweigh the evidence or resolve evidentiary conflicts, but uphold the lower court's determination if supported by substantial evidence " 'even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Id.* at p. 640, quoting *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

In considering the third element—whether termination of parental rights would be detrimental due to the relationship—the juvenile court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631–632.) The question is not whether the parent can provide a home for the child—that is not at issue in a section 366.26 hearing—it is whether on balance, the security of the new adoptive home outweighs the loss of the parental relationship. (*Id.* at pp. 634, 638.) In this inquiry, the court properly looks to the strength and quality of the relationship between the parent and the child. (*Id.* at p. 634.) A juvenile court's ruling as to this element, which requires a "delicate balancing," is reviewed for abuse of discretion, and we reverse only if the court's determination was " ' " 'arbitrary, capricious, or patently absurd.' " ' " (*Id.* at pp. 640–641.)

Significantly, as our high court explained in *Caden C.*, a parent may establish the beneficial relationship exception even if the parent still

12

struggles with the issues that led to the dependency. (*Caden C.*, *supra*, 11 Cal.5th at p. 637.)  That follows from the fact that reunification services are generally not terminated *unless* the parent has not made sufficient progress with those issues.  (*Ibid*.)  But that does not mean those issues are irrelevant to the exception, as "[a] parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child."  (*Caden C.*, at p. 637, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)  For instance, a parent's struggles with mental health may lead the parent to undermine a child's foster placement, thus negatively affecting the child, and a parent who gains a greater self-understanding may be better able to ensure that interactions benefit the child.  (*Caden C.*, at pp. 637–638.)

### *Stated Basis for Court's Ruling*

With these standards in mind, we consider Father's contentions.  In concluding that Minor and Father did not have a substantial positive attachment, the juvenile court reasoned as follows:  The visits between Father and Minor were good: they played together, laughed together, and Minor enjoyed the visits.  Nevertheless, based on "the evidence and also the bonding study," the court concluded "the quality of the relationship is not as strong as the visits seem to indicate."  Minor was six years old and had spent half her life out of the parents' custody.  Minor herself had asked not to have virtual visits with Father, suggesting the bond was "not as strong."  The evidence also indicated their relationship was "at times conflicted":  Minor told the court she would not be sad if she no longer saw Father, and neither her testimony nor the other evidence showed she looked to Father for support in her daily living and daily growth.  The court found it significant that Minor sometimes referred to Father by his first name or spelled out the word " 'dad.' "  The court also concluded the difficult relationship between Father

13

and the caregiver "cause[d] stress" in Minor's relationship with Father, and prevented him from supporting her relationships in her current home. Although the court explained that it could not consider whether Father would be able to maintain contact with Minor if she were adopted, it surmised that he would continue to want to keep in contact with two of his older children who lived in the same household as Minor and encouraged him to consider classes in co-parenting. Finally, as to concerns about Minor's connection to her cultural background, the court noted that she lived with three of her half-siblings who were biracial or triracial and that she attended a diverse school.

Father challenges this ruling on the indirect ground it was based on two unsound predicates—the bonding study and the Department's reports—and on the direct ground that the court improperly considered his relationship with the caregiver, possible future contact between himself and Minor, and Minor's opportunity to grow up with other multiracial children.

### *Reliance on Bonding Study*

First, Father argues, the bonding study upon which the trial court relied was itself flawed. The bonding study stated that the questions it was considering were the quality of the relationship between Father and Minor; to the extent it could be determined, whether the relationship was strong, beneficial to Minor, and healthy for Minor; and whether there were cultural components to the relationship that should be given extra consideration. As part of the study, the authors administered three tests to Father: a Personality Assessment Inventory, a Substance Use Subtle Screening Inventory, and a Trauma Symptom Inventory. They also outlined the results of clinical interviews with Father, including his personal and family history, an evaluation of Minor's early attachment to Father, and discussions of Minor's current placement and the Department's involvement. They went on

14

to discuss a clinical interview with Minor, the results of their clinical observations of the interactions between Father and Minor, and discussions they had had with the social worker and visitation supervisor, Father's wife and brother, and the caregiver. After this background, the bonding study provided its conclusions as to the questions posed.

Father criticizes the bonding study for what he describes as a "hyper focus" on his psychological shortcomings, particularly his alleged history of struggles with substance abuse. This focus, he argues, was improper because it turned on whether he had overcome the problems leading to the dependency rather than the strength and quality of his bond with Minor. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 634, 638.) For this contention, he relies on *In re M.V.* (2023) 87 Cal.App.5th 1155 (*M.V.*), which reversed an order terminating parental rights. In issuing the order, the juvenile court gave " 'much weight' " to a bonding study. (*Id*. at p. 1173.) The bulk of the bonding study concerned the psychologist's observations and psychological evaluations of the parents, including their physical appearances, intellectual functioning, personal and sexual history, and the results of psychological testing, and there was no indication the psychologist questioned the father about the nature or significance of the child's relationship with either parent. (*Id*. at p. 1177.) The study included only one sentence concerning the child's attachment to her parents and nothing about the consequences to her if the relationships were severed. But it included a lengthy discussion of the risk that would be involved in returning the child to her mother's care and a discussion of why adoption would be the best option in light of the child's attachment to her grandmother—one of the caregivers—and the likelihood that the parents would be able to continue their relationship with the child after adoption. (*Id*. at pp. 1177–1178.)

15

The appellate court concluded the evaluator had "profoundly misconceived his role." (*M.V.*, *supra*, 87 Cal.App.5th at p. 1180.)  That is, the evaluator did not consider the "minimum" questions of the child's age, the portion of the child's life spent in parental custody, the effect of interactions with the parents, and the child's particular needs (see *In re M.G.* (2022) 80 Cal.App.5th 836, 850), nor did he analyze the nature of the child's attachment to her parents or the effect that severing it would have on her, observe visits, or speak to the child in private.  (*M.V.*, at p. 1180.)  Instead, he "performed psychological evaluations of the parents, assessed their fitness to resume custody, . . . rendered opinions on the advisability of certain permanent placement possibilities," and "barely paid attention to [the child] in his report." (*Id.* at pp. 1180–1181.)  This "extreme focus on the parents" rather than on the quality of the child's relationship with them, combined with the evaluator's assumption that the child could maintain contact with the parents after adoption, rendered the bonding study inadequate.  (*Id.* at pp. 1181–1182.)

The appellate court went on to conclude that the juvenile court failed to apply the second and third elements of the *Caden C.* analysis properly.  Its analysis of whether the child would benefit from continuing the relationship was cursory and lacked an examination of whether she had a substantial, positive attachment to her parents, her age, her time in parental custody, the effects of interactions with the parents, and her particular needs.  (*M.V.*, *supra*, 87 Cal.App.5th at pp. 1184–1185.)  And this cursory analysis left the court unable to perform the weighing required by the third element, whether it would be detrimental to sever the child's relationship with her parents.  (*Id.* at p. 1185.)  Additionally, in giving great weight to the bonding study's analysis, the court failed to consider how the child would be affected by losing

16

the parental relationship and it impermissibly relied on the expectation that the child would remain in contact with her parents after adoption. (*Id.* at pp. 1185–1186.) The appellate court therefore remanded for a new bonding study to be prepared and a new section 366.26 hearing to be held. (*Id.* at p. 1186.)

Despite Father's arguments, we see no similar deficiencies in either the bonding study or the juvenile court's analysis. It is true that the bonding study here, like that in *M.V.*, included psychological testing and a discussion of the Father's personal history. (See *M.V.*, *supra*, 87 Cal.App.5th at p. 1177.) But a parent's mental health is not necessarily irrelevant to the beneficial relationship exception, as it may affect, positively or negatively, the parent's ability to support the child's needs. (*Caden C.*, *supra*, 11 Cal.5th at pp. 637–638.) And the bonding study *also* included a substantial discussions of the history of Minor's time with Father and the amount of contact they had at various points of her life; a clinical interview with Minor in which she was asked about her visits with Father and her feelings about virtual visits with him; a clinical observation of a visit between Minor and Father at which the quality and type of their interactions was evaluated; conversations with the social worker and visitation supervisor, who described the visits they had observed; conversations with Father's wife and brother, who also described his interactions with Minor; and a conversation with the caregiver, who described Minor's behavior during virtual visits and after visits. The report's conclusions discussed in detail the questions presented: the quality of the relationship between Minor and Father, the benefit of the relationship to Minor, and cultural considerations. It discussed the difficulties Father had in complying with his case plan and his conflicts with the caregiver, but the focus was largely on the barriers those factors posed to developing a strong

17

relationship with Minor and the detriment that might result from a continued relationship between them. In sum, even if the report considered extraneous factors, as a whole the report's focus was squarely where it belonged—on the strength and benefit to Minor of her relationship with Father.

In light of this, the juvenile court could properly rely on the bonding study in considering the questions before it. And in its ruling, the court expressly cited proper factors: On the one hand, Father's efforts to maintain the relationship, Minor's enjoyment of the visits, and the positive aspects of the relationship they shared; and on the other hand, the relative weakness in the relationship, as shown by Minor's own efforts to limit visits; her perception that she would not be saddened by not seeing Father again; the fact that she referred to him by his first name or by spelling out the word " 'dad' "; her young age; and the fact that she had spent half of her life away from her parents' custody. Based on these factors, the court found they did not share a substantial positive attachment. The court noted that Father did not meet Minor's need for support in her relationship with her caregivers, a matter reasonably related to the benefit she would derive from continuing the relationship. These factors closely track the factors our high court in *Caden C.* said were among the "slew" of factors that shape a relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) And it noted that Minor had the opportunity for a stable and permanent home and that her needs were being met in the home she shared with three siblings.

### *Considerations Regarding Caregivers' Household*

Nevertheless, Father contends the court took improper factors into consideration, specifically, his contentious relationship with one of the caregivers, the effect his future contact with his other children in the home

18

might have on Minor, and Minor's opportunity to grow up with multiracial children like herself.  This argument requires a review of the juvenile court's comments over the course of the extended section 366.26 hearing.

The section 366.26 hearing took place over four court days, two on February 26 and 28, 2025, at which witnesses gave testimony and the parties argued the matter, a third on March 18 at which the court considered a motion Minor brought to reopen evidence to include information regarding the dependencies of Minor's older half-siblings, and a fourth on April 1 at which the court gave its rulings.  When the court took the matter under submission at the end of the February 28 hearing, the court noted that Minor was living in a home with half-siblings who shared her African American heritage, it expressed its concern that Father and the caregiver had a contentious relationship, and it indicated it would have to consider "how that affects this particular child in this particular home in this particular setting."  At the March 18 hearing, the court noted that the factors it must consider were "straightforward" and said that it "struggle[d]" with the issues of Father's contentious relationship with the caregiver, the possibility that his visits with his other children might affect Minor, and the appropriateness of Minor's placement as a result, but that it might be a "red herring that I need to let go of."  The court took the matter under submission, explaining that it needed to give the matter more thought.

At the outset of the April 1, 2025 hearing, the court explained that it had reviewed the motion to reopen evidence, its notes from the trial, the Department's report for the section 366.26 hearing and addendum report, the bonding study, and also *Caden C*.  The court denied the motion to reopen evidence, saying the new information about the other children in the home was unnecessary to its ruling on the section 366.26 hearing.  The court went

19

on to reject the beneficial relationship exception and terminate parental rights; in the course of doing so, it explained that it had been concerned about the relationship between the caregiver and Father, but that it had concluded the focus of the hearing must be on Minor and her future stability, and the court could not consider whether or not Father would have contact with her in the future. It was in this context that the court noted that Father nevertheless had two other children in the home and that it might be helpful for him to consider co-parenting classes.

These proceedings do not show the court improperly took into account Father's relationship with the caregiver and future contact with his other children in the home when it rejected the beneficial relationship exception. Rather, they show the court considered the issues raised by the parties, reviewed the applicable law, and correctly concluded its focus must be on Minor in making its ruling. In this context, its comments about Father's possible future contact with the caregiver and his other children are most reasonably seen as general good advice rather than the basis for its ruling.

As for Father's contention that the court erred in noting that Minor had the opportunity to grow up with other multiracial children in the caregiver's household, we are unpersuaded. Father relies on *In re Andrew M.* (2024) 102 Cal.App.5th 803, which concluded a juvenile court had acted improperly in relying on the benefit a child would receive in maintaining contact with " 'broader family' " members in *applying* the beneficial relationship exception. (*Id*. at pp. 817–818.) But here, when discussing the fact that Minor lived with other biracial or multiracial children (and that she attended a diverse school), the court was considering an issue Father himself had raised—the parents' and the caregivers' racial backgrounds and the benefit to Minor from maintaining a connection to her African American heritage.

20

### *Reliance on Department's Recommendation*

Father also argues that the juvenile court's ruling was erroneous because the court acted in reliance on the Department's reports and, according to Father, the Department's recommendation to terminate parental rights was based on improper factors. He argues the Department's change of recommendation from guardianship to adoption was based largely on the "flawed" bonding study. We have already rejected Father's challenges to the bonding study. Father also complains that the Department's recommendation relied on extraneous factors such as Father's temperament and abrupt departure from a meeting with the social worker. But whatever weight the social worker should or should not have given to Father's behavior in considering whether the beneficial relationship exception applied, there is no indication the *juvenile court* was swayed by anything but permissible factors in reaching its own conclusions. We therefore reject this contention.

## II. Inadequate ICWA Inquiry

Father contends the juvenile court's finding that ICWA did not apply was based on an inadequate inquiry. As the Department concedes, this point is well taken.

Under ICWA, the juvenile court and the Department have an "affirmative and continuing duty to inquire" whether Minor is or may be an Indian child. (§ 224.2, subd. (a).) Because this duty is a continuing one, a juvenile court has a *present* duty of inquiry even if it previously found a child was not an Indian child and that order has become final. (See *In re Isaiah W.* (2016) 1 Cal.5th 1, 10; *In re Michael V.* (2016) 3 Cal.App.5th 225, 233–234.) As an initial matter, the duty of inquiry includes asking not only the child and parents, but also "extended family members, and others who have an interest in the child whether the child is, or may be, an Indian child." (*In re*

21

*D.F.* (2020) 55 Cal.App.5th 558, 566.) This "initial" duty of inquiry " 'continues throughout the dependency proceedings.' " (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1132.) Because ICWA is intended to protect the rights of Native American tribes, not those of parents, the issue may be raised for the first time on appeal. (*In re A.R.* (2022) 77 Cal.App.5th 197, 204.)

The February 2024 jurisdiction/disposition report showed that Mother had told the Department she did not have Native American ancestry and the social worker had tried to contact the maternal grandmother, apparently unsuccessfully. Father also reported no native American ancestry. The social worker had tried to contact Father to obtain information about his parents but had been unsuccessful. In March 2022, Father mentioned the paternal grandmother, paternal uncle, and paternal aunts as possible placements for Minor.

At the June 2022 jurisdictional and dispositional hearing, the juvenile court found ICWA did not apply to the case. Father and Mother both appealed this order (case Nos. A165732 & A165576), the appeals were consolidated, and on January 17, 2023 the parties stipulated to a reversal and remand for compliance with ICWA's notice provisions.

By January 12, 2023, the maternal grandmother had reported that she had no Native American ancestry. The Department had not had any contact with the maternal grandfather or any other maternal relatives. Father had not provided additional information about any paternal relatives. In May 2023, the juvenile court found ICWA inapplicable.

The record shows that multiple relatives were suggested for potential placement, including a maternal great aunt and a former maternal aunt, and that the Department had contact information for them. At the contested section 366.26 hearing, on February 26, 2025, Father mentioned that he had

22

four other children, two of them adults; that his parents were still alive and lived in Sacramento; and that he had four siblings. There is no indication the Department sought information from them about possible Indian ancestry. The juvenile court did not address ICWA while giving its ruling.

In sum, although the Department had the names and contact information of additional maternal relatives and information that Father had additional relatives that he suggested for placement, the record indicates that the Department contacted *only* the maternal grandmother about possible Native American ancestry. As the Department recognizes, this inquiry did not satisfy the requirement of inquiry of extended family members and others with an interest in Minor to determine whether she might be an Indian child. (See *In re D.F.*, *supra*, 55 Cal.App.5th at p. 566; *In re H.V.* (2022) 75 Cal.App.5th 433, 438.)

As the parties also agree, in these circumstances the appropriate remedy is a conditional reversal for the Department to carry out an adequate inquiry under ICWA. (See *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1152.)

## DISPOSITION

The order terminating parental rights is conditionally reversed. The matter is remanded to the juvenile court for compliance with ICWA's inquiry and notice requirements. If the juvenile court finds there has been an adequate further inquiry and concludes ICWA does not apply, the court shall reinstate its order terminating parental rights. If the juvenile court concludes ICWA applies, it shall proceed in accordance with ICWA and California's implementing provisions. (See *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1152.)

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*In re K.W.* (A172975)